## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONNA and DWAYNE HILL,     :
    **Plaintiffs**           :
                          :       **No. 1:21-cv-01424**
    **v.**                   :
                          :       **(Judge Rambo)**
SUPT. HARRY, <u>et</u> <u>al.</u>,        :
    **Defendants**        :

## <u>MEMORANDUM</u>

Pending before the Court are the parties' cross-motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. Nos. 50, 62.) Also pending before the Court is Plaintiff's motion to strike Defendants' brief in opposition to his motion for summary judgment, as well as Defendants' motion for summary judgment. (Doc. No. 64.) For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion for summary judgment. In addition, the Court will deny Plaintiff's motion to strike and motion for summary judgment.

## I.    BACKGROUND

On August 16, 2021, <u>pro</u> <u>se</u> Plaintiffs Dwayne Hill ("Plaintiff") and Donna Hill ("Mrs. Hill") (collectively, "Plaintiffs"), who are husband and wife,[1]

---

[1] Plaintiffs alleged that, even though Plaintiff is a prisoner in the custody of the Pennsylvania Department of Corrections and that Mrs. Hill is a resident of Pittsburgh, Pennsylvania, anything Plaintiff suffers physically, emotionally, and financially, Mrs. Hill likewise suffers. (Doc. No. 1 ¶¶ 17, 39, 42.)

commenced the above-captioned action by filing a complaint pursuant to the provisions of 42 U.S.C. § 1983 ("Section 1983"), asserting violations of their First, Eighth, and Fourteenth Amendment rights, as well as "the torts of assault[,] battery, negligence[,] and interference with their conjugal rights."  (Doc. No. 1 at 1.) Plaintiffs named the following individuals as defendants: State Correctional Institution Camp Hill ("SCI Camp Hill") Superintendent Harry ("Harry"); SCI Camp Hill Correctional Officer Knaub ("Knaub"); State Correctional Institution Phoenix ("SCI Phoenix") Superintendent Sorber ("Sorber"); SCI Phoenix Deputy Superintendents Bradley ("Bradley") and Terra ("Terra"); and SCI Phoenix Unit Manager Stenkowski ("Stenkowski").  (Id. at 2.)  In addition to the complaint, Plaintiffs also filed motions for leave to proceed in forma pauperis.  (Doc. Nos. 8, 10.)

In a Memorandum and Order, entered on September 8, 2021, the Court granted Plaintiffs leave to proceed in forma pauperis and screened the complaint pursuant to the Prison Litigation Reform Act ("PLRA").[2]  (Doc. Nos. 11, 12.)  In doing so, the Court partially dismissed the complaint for failure to state a claim upon which relief could be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  (Id.)  More specifically, the Court: (1) dismissed with prejudice Mrs. Hill's claims, as well as

---

[2] See The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996).

Plaintiff's Fourteenth Amendment due process claims concerning the deprivation of his personal property; (2) dismissed without prejudice Plaintiff's Section 1983 claims against Defendant Harry, as well as his Eighth Amendment claims concerning the denial of medical care at SCI Camp Hill; (3) transferred Plaintiff's claims against Defendants Sorber, Bradley, Terra, and Stenkowski to the United States District Court for the Eastern District of Pennsylvania since the alleged events concerning these Defendants occurred while Plaintiff was incarcerated at SCI Phoenix; (4) rendered moot Plaintiff's claims seeking declaratory and injunctive relief against Defendants Harry and Knaub, as Plaintiff had been transferred to SCI Phoenix and, thus, was no longer incarcerated at SCI Camp Hill; and, finally, (5) concluded that the complaint stated plausible First Amendment retaliation and Eighth Amendment excessive use of force claims against Defendant Knaub.  (Id.) In connection with all of these conclusions, the Court granted Plaintiff leave to file an amended complaint within thirty (30) days and noted that, if he failed to do so, this action would proceed only as to his First Amendment retaliation and Eighth Amendment excessive use of force claims against Defendant Knaub.  (Id.)

On September 21, 2021, Plaintiff filed an amended complaint.  (Doc. No. 16.) He again asserted his Fourteenth Amendment due process claim concerning the deprivation of his personal property, as well as his claims against Defendants Sorber, Bradley, Terra, and Stenkowski.  (Doc. No. 17 at 2.)   As the Court had previously

ruled, however, his Fourteenth Amendment due process claim concerning the deprivation of his personal property had been dismissed with prejudice, and his claims against Defendants Sorber, Bradley, Terra, and Stenkowski had been transferred to the United States District Court for the Eastern District of Pennsylvania for further proceedings.  (Id. at 2-3.)  As a result, the Court, in an Order entered on September 22, 2021, informed Plaintiff that this action would not proceed any further on those claims and that the only Defendants remaining before the Court are Defendants Harry and Knaub.  (Id.)

In the amended complaint, Plaintiff appears to assert the following claims against these (2) remaining Defendants: (1) First Amendment retaliation claims; (2) Eighth Amendment excessive use of force and denial of medical care claims; (3) a Fourteenth Amendment due process claim concerning his solitary confinement; and (4) state law tort claims for assault, battery, and negligence.  (Doc. No. 16 at 9-10.) In support of these claims, Plaintiff asserts the following allegations.

Plaintiff alleges that, on June 28, 2021, the unit manager at SCI Camp Hill, a non-party, called Plaintiff to appear for an informal misconduct hearing.  (Id. at 14.) The unit manager informed Plaintiff that Defendant Knaub had written Plaintiff an informal misconduct five (5) days prior for him being in an unauthorized area.  (Id. at 14-15.)  Plaintiff alleges that he told the unit manager he did not recall the incident and that he had not received any written notice of the incident, in violation of DC-

4

ADM 801.  (Id. at 15.)  Plaintiff further alleges that the unit manager responded that he was not entitled to such notice and tried to convince Plaintiff to accept an informal sanction.  (Id.)  Plaintiff claims that he refused to do so and that he informed the unit manager that he wished to challenge the charge at a formal hearing.  (Id.)

Plaintiff alleges that he subsequently approached Defendant Knaub about the informal misconduct, who confirmed that he had issued the misconduct based upon Plaintiff being, allegedly, in an unauthorized area.  (Id. at 16.)  Plaintiff told Defendant Knaub that he did not recall the incident and that he had not received any notice of the informal misconduct.  (Id.)  Defendant Knaub instructed him to "go to [his] cell."  (Id.)  Although Plaintiff tried to explain to Defendant Knaub that it was his exercise time, Defendant Knaub threatened to deploy OC spray if he did not return to his cell.  (Id.)  Plaintiff believes that Defendant Knaub instructed him to go to his cell in retaliation for him complaining about the "back dated misconduct." (Id.)

Plaintiff alleges that he was turning to go to his cell, when he looked back at Defendant Knaub, who sprayed him in the face.  (Id. at 17.)  Plaintiff claims that he did not try to resist and that Defendant Knaub's instruction (i.e., telling him to go to his cell) was not "clearly framed as an order[.]"  (Id.)  Plaintiff further claims that Defendant Knaub used "dangerous quantities" of OC spray on him, even though he has a "medical order" that prohibits the use of such spray on him.  (Id. (stating that

he has a "pre-existing respiratory condition").)  Thus, when Plaintiff tried to "block" the OC spray, Defendant Knaub used this as "pretext to further assault him" by "slamming" him to the ground.  (Id. at 18.)  Additionally, Plaintiff denies having a pencil.  (Id.)

As a result of this incident with Defendant Knaub, Plaintiff claims that he suffered serious injuries, including blurred vision, an asthma attack, and "injuries" to his neck, right elbow, and left knee from being slammed to the ground.  (Id.) Plaintiff acknowledges that "the medical department" stabilized his breathing, but that "the medical department" refused to treat his other reported injuries.  (Id. at 19.)

Plaintiff asserts that he was subsequently taken to solitary confinement and served with a misconduct report that was written by Defendant Knaub for assault and other related charges.  (Id.)  Plaintiff further asserts that the follow morning, on June 29, 2021, he was transferred from SCI Camp Hill to SCI Phoenix, where he was again placed in solitary confinement.  (Id.)  Plaintiff claims that Defendant Harry and former-Defendant Sorber arranged for this "immediate transfer[.]"  (Id.; id. at 20 (explaining that these types of institutional transfers that are immediate in nature are called "emergency transfers in prison policy" and are arranged by the superintendent at the sending institution and the superintendent at the receiving institution).)

6

Thereafter, on June 30, 2021, Plaintiff alleges that he met with the Program Review Committee at SCI Phoenix, which was comprised of former-Defendants Bradley, Terra, and Stenkowski. (Id. (explaining that the Program Review Committee supervises prisoners that are placed in solitary confinement).) According to Plaintiff, the Program Review Committee informed him that "[SCI] Camp Hill recommended that he be placed on the Restricted Release List[.]" (Id. at 21.) Plaintiff believes that Defendant Harry recommended him for this list in retaliation for him complaining to her about not addressing the property that her staff had allegedly stolen from him. (Id. at 28.)

Finally, Plaintiff alleges that, on July 2, 2021, he was served with Defendant Knaub's informal misconduct. (Id. at 25.) Plaintiff alleges that he had his "misconduct hearing on both reports[ ] on the same day." (Id.) Plaintiff claims that, on July 8, 2021, he was found guilty and sanctioned with ninety (90) days solitary confinement. (Id. at 26.) Plaintiff appears to contend that he attempted to appeal this decision, but encountered various issues throughout the process. (Id. at 24-27.)

In connection with all of these allegations, Plaintiff seeks declaratory and injunctive relief, compensatory damages, punitive damages, "litigation expenses[,]" and any "other relief" to which he is entitled. (Id. at 29.) In addition, he declares, "under penalty of perjury[,]" that all of the "facts" in his amended complaint are true and correct. (Id. at 29.)

On November 22, 2021, in response to Plaintiff's amended complaint, Defendants Harry and Knaub filed an answer.  (Doc. No. 27.)  That same day, the Court directed the parties to complete discovery within six (6) months and to file any dispositive motions within sixty (60) days of the date on which discovery closes.  (Doc. No. 28.)  After the Court issued that scheduling Order, Plaintiff filed a motion seeking leave to file a supplemental complaint (Doc. No. 33), a motion to compel discovery from Defendants (Doc. No. 36), and a motion for the appointment of counsel or, in the alternative, a motion to enjoin Defendants from using a third party to serve him  (Doc. No. 38).

On March 10, 2022, the Court issued an Order, denying Plaintiff's motion for the appointment of counsel without prejudice and deeming his request to enjoin Defendants withdrawn pursuant to Local Rule 7.5 of the Court's Local Rules.  (Doc. No. 39.)  Subsequently, on May 4, 2022, the Court issued a Memorandum and Order, denying Plaintiff's motions to file a supplemental complaint and to compel discovery from Defendants.  (Doc. Nos. 43, 44.)  Although Plaintiff filed a motion to vacate that Memorandum and Order (Doc. No. 47), which the Court construed as a motion for reconsideration, his request was denied.  (Doc. Nos. 76, 77.)

Thereafter, the parties filed cross-motions for summary judgment.  (Doc. Nos. 50, 62.)  Those motions have been briefed by the parties.  (Doc. Nos. 51, 58, 66, 70, 75.)  In addition, Plaintiff filed a motion to strike Defendants' brief in opposition to

his motion for summary judgment, as well as their motion for summary judgment. (Doc. No. 64.)  That motion has also been briefed by the parties.  (Doc. Nos. 65, 74.) Accordingly, the parties' cross-motions for summary judgment, and Plaintiff's motion to strike, are ripe for the Court's resolution.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law."  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  And, a disputed material fact is "genuine . . . [i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]"  See Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991) (citing Anderson, 477 U.S. at 248).

A party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—

that there is an absence of evidence to support the nonmoving party's case." See id. at 325.

Once the moving party has met its initial burden, the burden shifts to the nonmoving party, who may not rest upon the unsubstantiated allegations or denials of its pleadings and, instead, must go beyond its pleadings, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show a genuine dispute of material fact. See Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is proper. See id. at 322. Summary judgment is also proper if the nonmoving party provides evidence that is "merely colorable" or that "is not significantly probative[.]" See Gray, 957 F.2d at 1078.

In addition, when deciding a motion for summary judgment, "the court must view all evidence and draw all inferences in the light most favorable to the non-moving party[.]" See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008) (citing Davis v. Mountaire Farms, Inc., 453 F.3d 554, 556 (3d Cir. 2006)); M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 125 (3d Cir.

2020) (stating that, when reviewing a motion for summary judgment, courts are to "view the evidence in the light most favorable to the non-moving party").

## III.   DISCUSSION

As set forth above, there are several pending motions before the Court. (Doc. Nos. 50, 62, 64.) The Court will first address Plaintiff's motion to strike and then address the parties' cross-motions for summary judgment. Because Defendants' motion for summary judgment asserts arguments concerning the threshold issue of whether Plaintiff exhausted available administrative remedies before commencing suit in federal court, the Court will address Defendants' motion for summary judgment before it addresses Plaintiff's motion for summary judgment.

### A.   Plaintiff's Motion to Strike

In his motion to strike, Plaintiff requests that the Court strike Defendants' brief in opposition to his motion for summary judgment on the basis that "[t]here is a big difference in the number [of] pages filed in this Court, and what is being sent to Smart Communication for the Plaintiff." (Doc. No. 64 at 1-2.) Additionally, in his brief in support of his motion to strike, Plaintiff asserts various arguments concerning Defendants' method of service throughout this litigation, as well as discovery in this matter. (Doc. No. 65.) In connection with these various arguments, Plaintiff requests that the Court strike Defendants' pending motion for summary judgment. (Id. at 3.)

Defendants, in turn, have opposed Plaintiff's motion. (Doc. No. 74.) They argue that they have sent Plaintiff their complete filings, that Plaintiff has waived any argument concerning any discovery dispute, and that reopening discovery would not result in any further production of information since the items sought by Plaintiff have already been produced to him, are irrelevant, overbroad, and/or are privileged and confidential. (Id. at 3-12)

To the extent that Plaintiff argues that he did not receive Defendants' filings, or did not receive the entirety of those filings, the Court finds that any relief requested is now moot. Counsel for Defendants, who is an officer of this Court, represents that she served Plaintiff, via United States Mail, with complete copies of all documents Defendants filed in this matter, as is reflected by the certificates of service attached to each of those filings. (Doc. No. 74 at 5.) Further, counsel for Defendants also represents that, in an abundance of caution, a second copy of the following documents were sent to Plaintiff: Defendants' brief in opposition to Plaintiff's motion for summary judgment (Doc. No. 58); Defendants' response in opposition to Plaintiff's statement of material facts (Doc. No. 59); Defendants' motion for summary judgment (Doc. No. 62); Defendants' statement of material facts with supporting exhibits (Doc. Nos. 63; 63-1 through 63-8); and Defendants' brief in support of their motion for summary judgment (Doc. No. 66).

As such, Plaintiff's motion to strike will be denied to the extent that Plaintiff asserts allegations that he has not received Defendants' filings.  As discussed above, his request for relief is now moot.  See generally Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996) (explaining that "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot").

Additionally, to the extent that Plaintiff asserts any arguments concerning discovery in this matter, the Court finds his arguments unavailing.  The Court observes that, under the Federal Rules of Civil Procedure, the scope of discovery is broad: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  See Fed. R. Civ. P. 26(b)(1).  However, this broad scope of discovery "is not unlimited and may be circumscribed."  See Bayer AG v. Betachem, Inc., 173 F.3d 188, 191 (3d Cir. 1999) (citations omitted).

Moreover, and particularly relevant here is Rule 16(b)(4), which governs a party's request to modify a scheduling order.  See Fed. R. Civ. P. 16(b)(4).  More specifically, it provides that "[a] schedule may be modified only for good cause and with the judge's consent."  See id.  "[W]hether 'good cause' exists under Rule 16(b)(4) depends in part on a plaintiff's diligence."  See Premier Comp Sols., LLC

v. UPMC, 970 F.3d 316, 319 (3d Cir. 2020) (citations omitted); Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 84-85 (3d Cir. 2010) (concluding that the district court had properly denied leave to amend where plaintiff moved to amend his pleading after the amendment deadline had expired and where plaintiff had not been diligent in seeking the amendment).

In addition, the party seeking to modify the scheduling order carries the burden to demonstrate such good cause. See Fed. R. Civ. P. 16, Advisory Committee Note (1983) (explaining that "the court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension"); Race Tires, 614 F.3d at 84 (affirming the district court's decision to deny leave to amend, where the district court placed the burden on the movant under Rule 16(b)(4) to show "due diligence").   If the movant cannot demonstrate that he was diligent, then "there is no 'good cause' for modifying the scheduling order." See Bolus v. Carnicella, No. 15-cv-01062, 2020 WL 6203056, at *3 (M.D. Pa. Oct. 22, 2020) (citation omitted).

Here, Plaintiff's motion to strike, which asserts various discovery disputes, was not filed until long after the discovery period closed in this matter.   In fact, Plaintiff's motion to strike was not filed until after both he and Defendants filed their pending motions for summary judgment, statement of material facts, and accompanying exhibits. Despite this inordinate delay, Plaintiff has not alleged, much

less demonstrated to the Court, that he was diligent in filing his motion to strike or in seeking a modification of the Court's scheduling Order, which set a close of discovery deadline for May 23, 2022. (Doc. No. 28 (directing the parties to complete discovery within six (6) months of the date of the scheduling Order).)

Because Plaintiff has failed to show due diligence on his part, the Court finds no good cause for allowing him to seek discovery at this point in the litigation. Additionally, the Court finds that, even if Plaintiff had diligently sought discovery, the Court would still find that his motion is substantively deficient. By way of example, Plaintiff has neither provided a copy to the Court of the specific discovery requests he alleges he had previously propounded on Defendants, nor provided a copy of Defendants' responses thereto, if any. See M.D. Pa. L.R. 5.4 (requiring the moving party to file "a copy of the discovery matters in dispute").

Moreover, it appears that many of Plaintiff's discovery requests overlap with discovery requests he previously sent to Defendants in this matter. (Doc. No. 42.) As such, the Court is inclined to agree with Defendants that reopening discovery would not result in any further production of information, as the items sought by Plaintiff were already produced or objected to on the basis that the requests were overly broad, unduly burdensome, irrelevant, and/or privileged or confidential. (Id.) While Plaintiff may disagree with Defendants' substantive responses to his

discovery requests, he has not presently asserted any argument regarding those responses.

In addition, to the extent that Plaintiff's motion to strike can be construed as a motion filed under Rule 56(d) of the Federal Rules of Civil Procedure, the Court finds that Plaintiff's motion fares no better. While "it is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery[,]'" see Shelton v. Bledsoe, 775 F.3d 554, 565 (3d Cir. 2015), the docket reflects that Plaintiff was afforded that opportunity. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (noting the status of discovery and how the motion for summary judgment was filed after discovery had been conducted by the parties, and observing that "no serious claim [could] be made that [the nonmovant] was in any sense 'railroaded' by a premature motion for summary judgment").

Moreover, while under Rule 56(d), the nonmovant may file an "affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . " see Fed. R. Civ. P. 56(d), Plaintiff has not filed any such affidavit or declaration under that Rule. Additionally, Plaintiff has not shown how, if the discovery were disclosed, it would preclude summary judgment with respect to his surviving claims against Defendants. See Shelton, 775 F.3d at 568 (stating that summary judgment may be granted if "the Rule 56(d) declaration is inadequate"). In other words, Plaintiff has not taken the discovery requests and tied them to the

substantive arguments raised by Defendants in their pending motion for summary judgment. Finally, and as discussed above, Plaintiff has not shown why he was unable to seek this discovery, or Court intervention, any earlier.[3] Instead, Plaintiff rests on broad allegations that Defendants have not "not yet answered or served" their answers on him, without providing any factual or evidentiary support for the Court to consider. (Doc. No. 65 at 3.) As such, to the extent that Plaintiff's motion to strike is based upon arguments related to discovery, the Court will deny Plaintiff's motion.

Finally, as to Plaintiff's various complaints concerning Defendants' method of service in this matter, the Court finds Plaintiff's arguments unavailing. Department of Corrections' policy, DC-ADM 803, provides that "[a]ll incoming, **non-privileged** inmate correspondence must be addressed and sent to the Department's contracted central incoming inmate mail processing center," which is the Smart Communications center located in St. Petersburg, Florida. See DC-ADM 803, Inmate Mail and Incoming Publications Procedures Manual, Section 1(A), available at: https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (emphasis in original). Privileged mail only includes the following: "[m]ail from an

---

[3] As reflected by the Court's docket, Plaintiff previously filed a motion to compel discovery on January 18, 2022. (Doc. No. 36.) Plaintiff claimed, essentially, that he sent discovery requests to Defendants but that they had failed to respond. (Doc. Nos. 36, 37.) This motion was resolved by the Court. (Doc. Nos. 43, 44.)

inmate's attorney that is either hand-delivered to the facility by the attorney or delivered through the mail system[;]" [m]ail from a court[;]" and "[m]ail from an elected or appointed federal, state, or local official who has sought and obtained a control number issued by the Department's Office of Chief Counsel." See id., Glossary of Terms. However, "[n]ot all correspondence between an inmate and elected or appointed federal, state, or local official will require privileged correspondence processing. Control numbers will only be issued when the underlying matter involves matters related to a confidential investigation process or similar concerns." See id. Here, correspondence from Defendants' counsel is not considered privileged mail and, thus, must be sent to Plaintiff via the Smart Communications center in St. Petersburg, Florida.  As such, to the extent that Plaintiff's motion to strike is based upon any arguments concerning Defendants' use of the Smart Communications center, Plaintiff's motion will be denied.

Accordingly, for all of these reasons, Plaintiff's motion to strike will be denied.

### B.    Defendants' Motion for Summary Judgment

#### 1.    Statement of Material Facts

Under the Court's Local Rules, a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine

issue to be tried." See M.D. Pa. L.R. 56.1.  In addition, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement], as to which [the non-moving party] contend[s] that there exists a genuine issue to be tried." See id.  All material facts set forth in the moving party's statement "will be deemed to be admitted unless controverted by [the non-moving party's statement]." See id.

In accordance with the Court's Local Rules, Defendants filed a statement of material facts in support of their motion for summary judgment.  (Doc. No. 63.) Defendants statement is supported by citations to materials in the record.  (Id.)  In addition, although Plaintiff filed his own statement of material facts, responding to the numbered paragraphs set forth in Defendants' statement, Plaintiff has, for the most part, not supported his responsive statement with citations to materials in the record.  (Doc. No. 71.)  Thus, the Court is permitted to deem these facts admitted. See M.D. Pa. L.R. 56.1 (providing that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party").  That said, however, the Court has conducted a thorough and impartial review of the record in this matter.  To the extent that there are any disputed issues of material fact, the Court expressly notes such disputes herein.

19

Plaintiff, who was incarcerated at SCI Camp Hill during the period of time relevant to the underlying events, alleges that Unit Manager Taggart attempted to conduct an informal resolution hearing with him on June 28, 2021, concerning D542768, which had previously been issued by Defendant Knaub on or about June 23, 2021, in response to Plaintiff's alleged presence in an unauthorized area and Plaintiff's alleged refusal to obey an order.  (Doc. Nos. 63 ¶ 1; 71 ¶ 1.)  Defendants assert that Plaintiff refused to continue the informal resolution hearing with Unit Manager Taggart on June 28, 2021, and abruptly left after learning that the misconduct would become formal.  (Doc. No. 63 ¶ 2.)  Although Plaintiff concedes that he refused to continue the informal resolution hearing with Unit Manager Taggart, he contends that it was because he did not receive notice of the charges "in violation of DC-ADM 801."  (Doc. No. 71 ¶ 2.)  In support, he generally cites to misconduct D542768, but does not offer any further explanation.[4]  (Id.)

---

[4] The Court notes that, despite both parties making general references to misconduct D542768, it does not appear that the underlying report for this misconduct has been made a part of the record. (Doc. No. 63-2 at 2 (containing only Plaintiff's misconduct history with the DOC, which reflects misconduct number D542768, not the report itself).)  The Court further notes that, while misconduct D542768 provides context to the allegations in Plaintiff's amended complaint, neither Plaintiff's Section 1983 claims nor his state law tort claims are premised upon the language contained in the misconduct.  Finally, the Court notes that, Plaintiff does not dispute that he was found guilty of this misconduct by the hearing examiner.  (Doc. No. 71 ¶ 3.)  He does deny, however, whether he was found guilty on appeal by the Program Review Committee because he alleges that he "never received a response" from the Committee.  (Id.)

Plaintiff subsequently approached Defendant Knaub in the dayroom about the informal misconduct charge filed against him.  (Doc. Nos. 63 ¶ 4; 71 ¶ 4.)   It is at this point that the parties' version of the events diverge.  As for Defendants, they assert as follows: at the time Plaintiff approached Defendant Knaub, Plaintiff was agitated, and he was yelling and cursing (Doc. No. 63 ¶ 5); Defendant Knaub ordered Plaintiff to return to his cell (id. ¶ 6); Plaintiff challenged the direct order by questioning what would happen if he did not comply with it (id. ¶ 7); Defendant Knaub warned Plaintiff that he would deploy OC spray to gain his compliance (id. ¶ 8); Plaintiff then moved back towards Defendant Knaub while frantically reaching into his pocket to obtain what is now known to be a sharpened pencil (id. ¶ 9); Defendant Knaub took half a step backwards to create distance between himself and Plaintiff, and then deployed a single burst of OC spray on Plaintiff  (id. ¶ 10); at this time, Plaintiff lunged at Defendant Knaub with the sharpened pencil[5] and began physically attacking Defendant Knaub (id. ¶ 11); and, finally, in an effort to regain physical control of the situation, Defendant Knaub attempted to restrain Plaintiff and took him to the ground, holding Plaintiff's hands in place until more staff arrived and secured handcuffs on Plaintiff (id. ¶ 12).[6]

---

[5]  Defendants have submitted pictures in connection with their motion for summary judgment, which depicts a broken pencil.  (Doc. No. 63-1 at 71-76.)

[6]  There is documentation contained in the summary judgment record, which suggests that, based upon the alleged June 28, 2021 incident, Defendant Knaub

Plaintiff, however, asserts—largely via an affidavit that he has filed under the penalty of perjury—as follows: he was respectful and did not use abusive language with Defendant Knaub during this situation (Doc. No. 72 ¶ 30); he was told to go to his cell in retaliation for complaining about Defendant Knaub's failure to provide him with notice of the allegedly false misconduct (id. ¶ 31); he tried to explain to Defendant Knaub that he was permitted out of his cell for daily exercise, but Defendant Knaub threatened to spray him if he did not go to his cell (id. ¶ 32); when he turned to go to his cell, he looked back, and Defendant Knaub sprayed him in the face "without warning" (id. ¶ 33); Defendant Knaub did not call for a supervisor or try to defuse the situation in any way and, instead, used "dangerous quantities" of OC spray on Plaintiff (id. ¶ 37); and, finally, Defendant Knaub "tackled" and "slammed" Plaintiff to the ground when he could not see or brace himself for impact (id. ¶ 35).  In addition, Plaintiff asserts that it "was impossible" for him to have, allegedly, attacked Defendant Knaub with a pencil because he had his left hand out in order to block the OC spray, while his right hand remained in his pocket.  (Doc. No. 71 ¶ 11.)  Although Plaintiff cites to "video evidence[,]" it does not appear that any video evidence has been filed with the Court.

---

indicated that he "wish[ed] to pursue criminal charges against the inmate[.]"  (Doc. No. 63-1 at 78.)  Whether criminal charges were thereafter pursued or filed is unclear to the Court and not addressed by the parties.

Following the incident, Plaintiff received medical assessment and attention shortly after the handcuffs were applied to his person, and he was transported to medical.  (Doc. Nos. 63 ¶ 13; 71 ¶ 13.)  Plaintiff reported that he couldn't breathe and that he had chest and neck pain; however, no other injuries were noted or reported.  (Doc. Nos. 63 ¶ 14; 71 ¶ 14.)  Plaintiff received oxygen, two (2) treatments from his Xopenex inhaler, and the OC spray was cleansed from him—i.e., his face was cleansed and his eyes were flushed with eye wash solution.[7]  (Doc. Nos. 63 ¶ 15; 71 ¶ 15.)  Plaintiff's "[b]reathing pattern improved with [oxygen]." (Doc. Nos. 63 ¶ 16; 71 ¶ 16.)  After being assessed and treated by medical staff, Plaintiff was transported to the Restricted Housing Unit. (Doc. Nos. 63 ¶ 17; 71 ¶ 17.)

Defendant Knaub filed misconduct number D210958 against Plaintiff.  (Doc. Nos. 63 ¶ 18; 71 ¶ 18.)  Plaintiff did not submit a complete and proper appeal to the Chief Hearing Examiner with regards to misconduct number D210958. (Doc. Nos. 63 ¶ 19; 71 ¶ 19.) In addition, Defendant Harry signed paperwork relating to the approval of Plaintiff's transfer from SCI Camp Hill to SCI Phoenix. (Doc. Nos. 63 ¶ 20; 71 ¶ 20.)  Plaintiff was transferred to SCI Phoenix on June 29, 2021, and placed into the Restricted Housing Unit. (Doc. Nos. 63 ¶ 21; 71 ¶ 21.)

---

[7] Although Plaintiff asserts that the OC spray was not "cleansed" from him and that it remained in his hair, neck, arms, and clothing, Plaintiff has cited to "video evidence[,]" which, again, does not appear to be a part of the record.  (Doc. No. 71 ¶ 15.)

After the June 28, 2021 incident, the housing unit was locked down, and Plaintiff's property was secured within his cell. (Doc. Nos. 63 ¶ 22; 71 ¶ 22.)  Staff then inventoried Plaintiff's property and arrangements were made for the property to be shipped to SCI Phoenix, the facility where Plaintiff was transferred. (Doc. Nos. 63 ¶ 23; 71 ¶ 23.)  After arriving at SCI Phoenix, Plaintiff met with the Program Review Committee on June 30, 2021. (Doc. Nos. 63 ¶ 24; 71 ¶ 24.)  Department records indicate that PRC members at SCI Phoenix indicated that Plaintiff would be processed for the Restricted Release program due to numerous prior assaults and not appropriate for population. (Doc. Nos. 63 ¶ 25; 71 ¶ 25.)  Although a facility manager may request that an inmate be placed on a restricted release list, "the Executive Deputy Secretary for Institutional Operations (EDSI) must approve placing the inmate in this status."  (Doc. Nos. 63 ¶ 26; 71 ¶ 26.)

Defendants assert that Plaintiff did not file an inmate grievance with respect to any retaliation claim against Defendants Harry and Knaub. (Doc. No. 63 ¶ 27.)  However, Plaintiff filed the following inmate grievance numbers with respect to Defendant Knaub's use of OC spray on June 28, 2021: 934590; 935485; and 935632. (Doc. Nos. 63 ¶ 28; 71 ¶ 28.)  Grievance numbers 934590, 935485, and 935632 were rejected and referred to the DC-ADM 001 Inmate Abuse Investigation process. (Doc. Nos. 63 ¶ 29; 71 ¶ 29.)  The DC-ADM 001 Inmate Abuse Investigation is ongoing.  (Doc. Nos. 63 ¶ 30; 71 ¶ 30.)

24

### 2.    Defendants' Arguments

### a.    Exhaustion

Initially, Defendants argue that Plaintiff failed to exhaust available administrative remedies in accordance with the PLRA prior to filing suit in this Court.  (Doc. No. 66 at 17-22.)  Plaintiff argues, however, that "[t]he undisputed facts show that [he] exhausted all available remedies."  (Doc. No. 70 at 2.)  The Court, having reviewed the parties' arguments and the underlying record in this matter, concludes that Defendants have met their affirmative defense of Plaintiff's failure to exhaust available administrative remedies as to some of his surviving Section 1983 claims.

The PLRA's exhaustion requirement mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a) (emphasis added).   In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding his prison conditions.  See Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548

U.S. 81, 85 (2006)); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pennsylvania Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (quoting Woodford, 548 U.S. at 88). And the applicable "procedural rules are supplied by the individual prisons." See id. (citations omitted); Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances . . ." ); see also Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim . . . "); Woodford, 548 U.S. at 90 (stating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ").

A prisoner's failure to follow these procedural rules will result in a procedural default of his claims. See id. at 230–32 (concluding that the PLRA's exhaustion requirement includes a procedural default component); Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (recognizing this holding in Spruill). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. See Rinaldi v. United States, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting Woodford, 548 U.S. at 93)). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).

The failure to exhaust available administrative remedies is an affirmative defense. See Jones, 549 U.S. at 216. Accordingly, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." See Rinaldi, 904 F.3d at 268 (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)). However, "once the defendant has established that the inmate failed to resort to administrative

remedies, the onus falls on the inmate to show that such remedies were unavailable to him."  See id. (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA— to "return[ ] control of the inmate grievance process to prison administrators, encourage[ ] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."  See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted) (alterations added)); Jones, 549 U.S. at 204 (explaining that the exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").

Here, the Court begins its discussion by identifying Plaintiff's remaining Section 1983 claims against Defendants Harry and Knaub in this action: First Amendment retaliation claims; Eighth Amendment excessive use of force claims; Eighth Amendment denial of medical care claims; and a Fourteenth Amendment due process claim.  (Doc. No. 16 at 9-10.)  Regarding these claims, Defendants argue that Plaintiff has failed to exhaust his administrative remedies in accordance with DC-ADM 801 and DC-ADM 804. Defendants, however, have not filed either DC-ADM 801 or DC-ADM 804 in connection with their motion for summary judgment.

(Doc. Nos. 63-1 through 63-8.)  That said, the Court recognizes that the current versions of these policies and procedures manuals are publicly available on the DOC's website.

As for DC-ADM 801, the Court observes that both the policy statement and the procedures manual set forth in DC-ADM 801 have an effective date of May 23, 2022, a date <u>after</u> the alleged violations of Plaintiff's constitutional rights occurred. In other words, Defendants have neither shown which version of DC-ADM 801 was in effect and applicable to the events that Plaintiff complains of here, nor shown how Plaintiff failed to comply with the specific provisions of that version of DC-ADM 801.  Moreover, although Defendants have submitted the declaration of Zachary Moslak, the Chief Hearing Examiner for the DOC, that declaration does not clarify the issue.  <u>See</u> (Doc. No. 63-3 at 2, ¶ 2 (stating, only generally, that "DC-ADM 801 governs an inmate's ability to appeal an adverse misconduct decision").  Accordingly, to the extent that Defendants seek dismissal of Plaintiff's claims on the basis that Plaintiff failed to exhaust available administrative remedies under DC-ADM 801, the Court finds that Defendants have not met their burden.

As for, DC-ADM 804, however, the Court observes that the policy statement has an effective date of May 1, 2015, and the procedures manual has an effective date of February 16, 2016.  Accordingly, it appears that the current version of DC-

ADM 804 preceded, and thus governs, the events that Plaintiffs complains of here. See (Doc. No. 16 (complaining of events that occurred in June of 2021)).

Under DC-ADM 804, it is the express policy of the DOC for every inmate in its custody to have access to a formal procedure through which the inmates can "seek resolution of problems or other issues of concern arising during the course of [their] confinement." See DC-ADM 804, Policy Statement, § 3. This formal procedure is referred to by the DOC as the "Inmate Grievance System" (id.), and it is comprised of three (3) separate steps (id., Inmate Grievance System Procedures Manual, §§ 1-2). The first step is that the inmate is required to submit a grievance to the Facility Grievance Coordinator or designee, usually the Superintendent's Assistant, within fifteen (15) working days after the event upon which the grievance is based. (Id. at § 1, A.8.) The second step is that the inmate is required to appeal an initial review response/rejection to the Facility Manager or designee within fifteen (15) working days from the date of the initial review response/rejection. (Id. at § 2, A.1) The third step is that the inmate is required to appeal the Facility Manager/designee's decision to final review at the Secretary's Office of Inmate Grievances and Appeals within fifteen (15) working days of the date of the Facility Manager/designee's decision. (Id. at § 2, B.1)

The Court now turns to Plaintiff's Section 1983 claims to determine whether Defendants have met their burden to establish the affirmative defense of Plaintiff's failure to exhaust administrative remedies in accordance with DC-ADM 804.

### i.     Plaintiff's First Amendment Retaliation Claims

Regarding Plaintiff's First Amendment retaliation claims, Defendants Harry and Knaub argue that Plaintiff did not file any grievances against them concerning retaliation.  (Doc. No. 66 at 19, 20.)  In support, Defendants Harry and Knaub cite to Plaintiff's inmate grievance history (Doc. No. 63-7), a document which contains various information related to the grievances that Plaintiff has filed while in the custody of the DOC.   (Doc. No. 66 at 20 (citing Doc. No. 63 ¶ 27).)   That documentation reflects that between July 6, 2021 (i.e., the first date on which he filed a grievance after the June 28, 2021 incident at SCI Camp Hill) and October 25, 2021 (the last date on which he filed a grievance), Plaintiff filed numerous grievances concerning the following issues: property; abuse; commissary; health care; visits; due process; phone; mail; housing/cell assignment; and health care.  (Doc. No. 63-7 at 8-9.)  As seemingly argued by Defendants, none of those issues suggest that Plaintiff filed any grievances concerning any alleged retaliation.  See (id.).

In response, however, Plaintiff argues that he properly exhausted his First Amendment retaliation claims against Defendants Harry and Knaub.  (Doc. No. 70 at 4 .)   Although Plaintiff does not cite to any material in the record, such as a

grievance, the Court has conducted an independent and thorough review of the record in this matter, and observes that, in grievance 935485, Plaintiff not only asserts allegations against Defendant Knaub for the alleged "assault" based upon the use of OC spray June 28, 2021, but he also asserts an allegation for "retaliation" based upon a "false misconduct[.]"  (Doc. No. 75-1 at 2 (containing his "Official Inmate Grievance" for number 935485 on a "DC-804 Part 1" form).)  Accordingly, to the extent that Defendants argue that Plaintiff "did not file any inmate grievances concerning any alleged retaliation" with respect to Defendant Knaub (Doc. No. 66 at 20), the Court finds that their argument is without merit.  Thus, the Court will deny their motion for summary judgment on this basis.[8]

However, to the extent that Defendants argue that Plaintiff "did not file any inmate grievances concerning any alleged retaliation" with respect to Defendant Harry concerning his transfer to SCI Phoenix (Doc. No. 66 at 20), the Court agrees. Indeed, the record reflects that Plaintiff did not file any grievance that either

---

[8]  While not presently before the Court, the Court notes that Defendants have not addressed the issue of why Plaintiff's retaliation claim against Defendant Knaub, which is based upon an allegedly false misconduct, would not fall within the scope of DC-ADM 801 and not DC-ADM 804.  See DC-ADM 804, § 1, A.7 (stating that "[i]ssues concerning a specific inmate misconduct charge, conduct of hearing, statements written within a misconduct and/or other report, a specific disciplinary sanction, and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, 'Inmate Discipline' and/or DC-ADM 802, 'Administrative Custody Procedures' (emphasis added and emphasis omitted)).

identified Defendant Harry either by name or by title, or described her alleged retaliation. See DC-ADM 804, § 1, A.11 (explaining that, under DC-ADM 804, the inmate's grievance must include "a statement of the facts relevant to the claim" and must "identify individuals directly involved in the event(s)").

Accordingly, the Court finds that Defendants have met their affirmative defense that Plaintiff failed to exhaust available administrative remedies under DC-ADM 804 as it pertains to Plaintiff's First Amendment retaliation claim against Defendant Harry. See Downey, 968 F.3d at 305 (stating that "[t]he PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules'" (quoting Woodford, 548 U.S. at 88)); Jones, 549 U.S. at 218 (stating that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules[, which are] rules that are defined not by the PLRA, but by the prison grievance process itself" (citation and internal quotation marks omitted)).

The Court further finds that Plaintiff has neither alleged, nor shown that those remedies were unavailable to him. At most,[9] Plaintiff appears to assert that he was

---

[9] To the extent that Plaintiff claims that he faced "insurmountable time barriers" or a "prison policy that prohibits him from corresponding with staff through mail" (Doc. No. 70 at 3), the Court notes that Plaintiff has offered no specific factual allegations or evidentiary support in support of such claims.

transferred from SCI Camp Hill to SCI Phoenix, and, thus, could not exhaust. The Court observes, however, that after Plaintiff was transferred from SCI Camp Hill to SCI Phoenix, he was still proceeding in this action on a Section 1983 amended complaint, which he filed as a prisoner and wherein he asserted claims related to his prison conditions. (Doc. No. 16.)  As such, Plaintiff was still under a duty to exhaust available administrative remedies, as required by the PLRA.  <u>See</u> 42 U.S.C. § 1997e(a) (containing the PLRA's exhaustion requirement, which mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted").  In other words, Plaintiff's transfer <u>alone</u> does not excuse his duty to exhaust.

In addition, DC-ADM 804 does not prohibit a Plaintiff from filing a grievance after he is transferred to a different correctional institution.  Instead, the express language of DC-ADM 804 directs that the inmate file the grievance where the complained-of-events occurred.  <u>See</u> DC-ADM 804, Inmate Grievance System Procedures Manual, § 1, A. (9) (stating that the grievance "must be filed with the Facility Grievance Coordinator/designee <u>at the facility where the grievance event occurred</u>" (emphasis added)).  And, here, Plaintiff asserts no allegations that he filed, or attempted to file, a grievance "at the facility where the grievance event occurred."

See id.  As such, the Court will dismiss Plaintiff's First Amendment retaliation claim against Defendant Harry for his failure to exhaust available administrative remedies under DC-ADM 804.

### ii.    Plaintiff's Eighth Amendment Excessive Use of Force Claims

Regarding Plaintiff's Eighth Amendment excessive use of force claim, Defendants raise several arguments.  Initially, Defendants acknowledge that Plaintiff filed several grievances (i.e., grievances 934590, 935485, and 935632) concerning Defendant Knaub's use of OC spray on June 28, 2021.  (Doc. No. 66 at 20.) Defendants contend, however, that these grievances do not concern Defendant Harry or encompass Defendant Harry in any way.  (Id.)  The Court agrees.

As discussed above, DC-ADM 804 requires the inmate's grievance to include "a statement of the facts relevant to the claim" and to "identify individuals directly involved in the event(s)."  See DC-ADM 804, § 1, A.11.  While Grievances 934590, 935485, and 935632, specifically identify Defendant Knaub and the facts relevant to Plaintiff's claim against Defendant Knaub, these grievances neither mention Defendant Harry or her position of Superintendent at SCI Camp Hill, nor offer any relevant facts or dates with respect to Defendant Harry.  Thus, while Plaintiff now claims in his amended complaint that Defendant Harry knew that prison officials were regularly and excessively using OC spray as a means of punishment (Doc. No. 16 at 28), Plaintiff asserted no such allegations in his grievances.  As such, he failed

to put prison officials on notice that he sought to hold Defendant Harry accountable for such alleged conduct.  See Williams v. Beard, 482 F.3d 637, 640 (3d Cir. 2007) (stating that "the primary purpose of a grievance is to alert prison officials to a problem . . ." (citation and internal quotation marks omitted)).

Thus, the Court concludes that Defendants have met their burden to establish their affirmative defense that Plaintiff failed to exhaust his Eighth Amendment excessive use of force claim against Defendant Harry in accordance with the provisions of DC-ADM 804.  See Downey, 968 F.3d at 305 (stating that "[t]he PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules'" (quoting Woodford, 548 U.S. at 88)); Jones, 549 U.S. at 218 (stating that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules[, which are] rules that are defined not by the PLRA, but by the prison grievance process itself" (citation and internal quotation marks omitted)).

The Court further finds that Plaintiff has neither alleged, nor shown that those remedies were unavailable to him.  As stated above, Plaintiff's transfer alone does not excuse his duty to exhaust, and the express language of DC-ADM 804 did not prohibit him from filing a grievance.  Instead, it directed him to file a grievance where the complained-of-events occurred.  See DC-ADM 804, Inmate Grievance

System Procedures Manual, § 1, A. (9) (stating that the grievance "must be filed with the Facility Grievance Coordinator/designee <u>at the facility where the grievance event occurred</u>" (emphasis added)).[10]

Next, Defendants contend that, although Plaintiff filed several grievances concerning Defendant Knaub's use of OC spray on June 28, 2021, Plaintiff did not properly exhaust available administrative remedies.  (Doc. No. 66 at 21.)  In support, Defendants assert two (2) arguments: (1) these grievances "were referred to the DC-ADM 001 Inmate Abuse Investigation process with the investigation continuing to present date[,]" and, thus, Plaintiff should have waited "to learn of the completion of the investigations for these grievances . . . " (<u>id.</u> (citing Doc. No. 63 ¶¶ 28-30)); and (2) Plaintiff failed to appeal each of these grievances "to the final appeals process under DC-ADM 804" (<u>id.</u>).

The Court, however, is unpersuaded by these arguments.  Defendants' own statement of material facts and documentary evidence demonstrate that Plaintiff's abuse allegations against Defendant Knaub, using DC-ADM 804, "were rejected and referred" by prison officials to the DC-ADM 001 Inmate Abuse Investigation process.  (Doc. No. 63 ¶ 29; Doc. No. 63-8 at 2, 4.)  As a result, this takes any

---

[10]  As noted above, to the extent that Plaintiff claims that he faced "insurmountable time barriers" or a "prison policy that prohibits him from corresponding with staff through mail" (Doc. No. 70 at 3), the Court notes that Plaintiff has offered no specific factual allegations or evidentiary support in support of such claims.

persuasive force out of Defendants' argument that Plaintiff was, nevertheless, required to appeal his grievances all the way to final review under DC-ADM 804. Indeed, Plaintiff could not reasonably be expected to pursue the various levels of review under DC-ADM 804, when his grievance was initially rejected under that avenue of relief and referred to a different avenue of relief, i.e., DC-ADM 001.

Additionally, and as stated above, Defendants also argue that Plaintiff should have waited until the completion of the internal investigation under DC-ADM 001 before commencing suit in this Court.  (Doc. No. 66 at 21.)  In support of this argument, Defendants have pointed to  Victor v. Lawler, 565 F. App'x 126 (3d Cir. 2014) (unpublished) to argue that Plaintiff's failure to wait completion of the investigation under DC-ADM 001 amounts to his failure to administratively exhaust. In that case, after the inmate filed a grievance, "the grievance officer filed an Initial Review Response stating that he had reviewed the grievance and that it was being investigated by the Security Office." (Id. at 129-30.) "On appeal, the Superintendent stated in a document dated November 8, 2007, that he concurred with the response given by the grievance officer, and noted that 'an ongoing investigation into your allegations is in progress.'" (Id. at 130.)  The inmate "filed his complaint about a week later, without waiting for that investigation to conclude." (id.)  The Court of Appeals stated that "[t]his defeats the basic purpose of the grievance filing

mechanism, which is to notify officials of a problem and provide an opportunity for efficient correction." (Id. (citation and internal quotation marks omitted).

Here, the record reflects that, as early as July 7, 2021, DOC officials informed Plaintiff that his grievance was "being forwarded to the Security Office for investigation in accordance with Department policy DC-ADM 001." (Doc. No. 63-8.)  Although it is unclear to the Court what internal steps were taken after that date, Defendants repeatedly assert that the investigation under DC-ADM 001 was still "ongoing" at the time they filed their motion for summary judgment on August 22, 2022, and at the time they filed their reply brief in connection with their motion for summary on October 5, 2022.  See, e.g., (Doc. Nos. 63 ¶ 30; 66 at 21; 75 at 13.)

Thus, in light of this record, the Court observes that Plaintiff commenced this lawsuit approximately three (3) months after receiving confirmation that his grievance was being forward to the Security Office for internal investigation in accordance with DOC policy set forth in DC-ADM 001, and that the internal investigation has now been pending for at least one year and three (3) months.  In addition, the Court observes, as it did above, that Defendants have not submitted a copy of DC-ADM 001 to the Court in connection with their motion for summary judgment.  (Doc. Nos. 63-1 through 63-8.)  While the current version of DC-ADM 001 is publicly available on the DOC's website, both the policy statement and the procedures manual set forth in DC-ADM 001 have effective dates in April 2022,

which are dates <u>after</u> the violations of Plaintiff's constitutional rights are alleged to have occurred.

As a result, it is not clear what version of DC-ADM 001 was in effect and applicable to Plaintiff's claim of excessive use of force against Defendant Knaub. It is also not clear, therefore, as to what occurs after a grievance is referred to the Security Office for investigation—such as the timing, content, or scope of review with respect to the investigation or the manner in which an inmate will be notified of results of the investigation. The Court finds that this lack of clarity in the record is particularly problematic here, where Defendants have not clearly alleged or shown what has occurred with the internal investigation since July 7, 2021.[11]

Thus, while <u>Victor</u> may be persuasive here, the Court is unable to make that determination based upon the arguments presented, and the evidentiary documents submitted, by Defendants. Accordingly, for all of these reasons, the Court is constrained to find that Defendants have not met their burden to demonstrate that Plaintiff failed to exhaust available administrative remedies with respect to his Eighth Amendment excessive use of force claim against Defendant Knaub. As such, the Court will deny their motion on this basis. <u>See Jones</u>, 549 U.S. at 216 (explaining that the failure to exhaust available administrative remedies is an affirmative

---

[11]   For the first time in their reply brief, Defendants assert, without citing to any evidentiary support, that "extensions" have "been sought." (Doc. No. 75 at 13.) The Court notes that it has no context for this assertion.

defense); <u>Rinaldi</u>, 904 F.3d at 268 (stating that "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant" (citing <u>Ray</u>, 285 F.3d at 295)).

### iii.    Plaintiff's Eighth Amendment Medical Care and Fourteenth Amendment Due Process Claims

Although Defendants assert administrative exhaustion arguments concerning Plaintiff's First Amendment retaliation claims and Eighth Amendment excessive use of force claims, from what the Court can discern, Defendants have not asserted any exhaustion arguments as to Plaintiff's Eighth Amendment medical care claims and Fourteenth Amendment due process claim against Defendants Harry and Knaub. As such, the Court need not address these claims any further in the context of exhaustion. To the extent, however, that Defendants seek summary judgment on this basis, their motion will be denied.

### iv.    Plaintiff's Request for Monetary Relief

The final argument that Defendants assert concerning administrative exhaustion is that Plaintiff failed to make a request for monetary relief and, as such, he is barred from seeking monetary damages in federal court. (Doc. No. 66 at 21-22.) In support, Defendants cite to grievances 934590 and 935632. (<u>Id.</u> at 22 (citing Doc. No. 63-8 at 3, 5).) In both of those grievances, Plaintiff requests "all relief the law allows." (<u>Id.</u>) He does not, however, specifically reference "monetary" relief

or damages.  See (id.).  In this regard, the Court observes that, under DC-ADM 804, if an "inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." See DC-ADM 804, § 1., A.11.d.

As discussed above and conceded by Defendants, these grievances were "rejected and referred to the DC-ADM 001 Inmate Abuse Investigation process." (Doc. No. 63 ¶ 29.)  Defendants, however, have not addressed this exhaustion argument in connection with DC-ADM 001 regarding Plaintiff's Eighth Amendment excessive use of force claims.  In addition, they have not addressed Plaintiff's Eighth Amendment denial of medical care claim.  As such, the Court concludes that Defendants' arguments concerning whether Plaintiff failed to exhaust his request for monetary relief is not properly before the Court at this time.  Thus, Defendants have not met their burden to show that Plaintiff failed to exhaust available administrative remedies with respect to his claim for monetary damages.  The Court will, therefore, deny their motion on this basis.

### v.    Conclusion as to Exhaustion

To conclude, Defendants have met their burden to establish the affirmative defense of Plaintiff's failure to exhaust available administrative remedies with respect to his First Amendment retaliation claim and Eighth Amendment excessive use of force claim against Defendant Harry.  As such, summary judgment will be

granted in favor of Defendant Harry with respect to these claims. Defendants have not, however, met their burden to establish the affirmative defense of Plaintiff's failure to exhaust available administrative remedies with respect to his First Amendment retaliation claim and Eighth Amendment excessive use of force claim against Defendant Knaub, his Eighth Amendment denial of medical care claims against both Defendants, and his request for monetary relief. As such, the Court will address Defendants' remaining arguments as they relate to these remaining claims.

### 3.   Plaintiff's First Amendment Retaliation Claim Against Defendant Knaub

In order to state a First Amendment retaliation claim against Defendant Knaub, Plaintiff must show that: "(1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of [Defendant Knaub]; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citation and internal citation omitted). However, even if Plaintiff states a prima facie case of retaliation, "[Defendant Knaub] may still prevail if [he] establish[es] that "[he] would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." See id. (citation and internal quotation marks omitted).

Here, liberally construing Plaintiff's amended complaint, he appears to allege that he engaged in constitutionally protected activity by filing a grievance (Doc. No.

16 ¶¶ 15-17, 38) and by complaining about an allegedly false misconduct (id. ¶¶ 28, 32-35, 37). He also appears to allege that, as result of engaging in this constitutionally protected conduct, he suffered the following adverse actions at the hands of Defendant Knaub: Plaintiff was told to go to his cell (id. ¶ 37); and he was sprayed with OC spray (id. ¶¶ 38-39). Finally, he asserts that his constitutionally protected conduct (i.e., filing a grievance and complaining about an allegedly false misconduct) were a substantial or motivating factor in the adverse actions that Defendant Knaub took against him (i.e., telling him to go to his cell and spraying him with OC spray). (Id. ¶¶ 15-17, 28, 32-35, 37-39.)

In moving for summary judgment on Plaintiff's First Amendment retaliation claim, Defendants raise several arguments. The Court addresses each of these arguments in turn below.

### a.    Constitutionally Protected Conduct

Defendants argue that, to the extent that Plaintiff seeks to allege that he engaged in constitutionally protected conduct by complaining about an allegedly false misconduct, the amended complaint did not include such allegations and, thus, it is improper for Plaintiff to attempt to amend the amended complaint via his briefing. (Doc. No. 75 at 16-17.) The Court, however, is unpersuaded by this argument. While the Court agrees that a majority of Plaintiff's allegations focus on his constitutionally protected conduct of filing a grievance, the amended complaint

also alleges that Defendant Knaub retaliated against him for "complaining about the back dated misconduct." (Doc. No. 16 ¶ 37.)   Moreover, Plaintiff's relevant grievances (i.e., grievances 934590, 935485, and 935632) reveal allegations, which either explicitly or impliedly suggest that Defendant Knaub sprayed Plaintiff with OC spray in retaliation for Plaintiff complaining about the allegedly false misconduct Defendant Knaub wrote.  (Doc. Nos. 75-1 at 2 (explicitly); 63-8 at 3 (impliedly) and 5 (impliedly).)

Thus, the Court treats the amended complaint as asserting allegations that Plaintiff engaged in constitutionally protected conduct when he complained about the allegedly false misconduct.  In doing so, the Court reaffirms the long-standing principle that pro se documents are "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972) (stating that a pro se complaint, "however inartfully pleaded," will be held to "less stringent standards than formal pleadings drafted by lawyers").  Accordingly, to the extent that Defendants argue that the Court should not consider these allegations as asserting a potential form of constitutionally protected conduct, the Court finds Defendants' argument unavailing.

Defendants do not dispute, however, that Plaintiff's allegations of filing a grievance constitute constitutionally protected conduct, and for good reason.  The filing of lawsuits and prison grievances constitute activity protected by the First

Amendment.  See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (reiterating its prior holding that a prisoner-plaintiff engages in constitutionally protected activity when he files a grievance against a prison official (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003))); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (reiterating its prior holding "that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts" (citation omitted)); Allah v. Seiverling, 229 F.3d 220, 223-25 (3d Cir. 2000) (concluding that the prisoner-plaintiff had stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials).

Accordingly, to the extent that Defendants seek summary judgment on Plaintiff's First Amendment retaliation claim on the basis that Plaintiff has failed to establish that he engaged in constitutionally protected activity, the Court will deny their motion.

### b.  Adverse Action

Next, Defendants argue that, to the extent that Plaintiff seeks to allege that he suffered an adverse action when Defendant Knaub told him to return to his cell, such allegations fail to establish an adverse action for retaliation purposes.  (Doc. No. 75 at 17.)  The Court agrees.  An adverse action is one that is "sufficient to deter the

exercise of First Amendment rights[.]" See Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017); Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015), (explaining that an adverse action must be "sufficient to deter a person of ordinary firmness from exercising his constitutional rights . . . " (citation omitted)).  The Court cannot find that Plaintiff, a state prisoner in the custody of the DOC, suffered an adverse action when he was told to go to his cell, as this is "simply too de minimis to constitute adverse action."  See Christian v. Garman, No. 1:20-cv-01842, 2021 WL 1017251, at *4 (M.D. Pa. Mar. 17, 2021) (citations omitted); see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct "need not be great in order to be actionable, but it must be more than de minimis" (citations and internal quotation marks omitted)).

Accordingly, to the extent that Defendants seek summary judgment on Plaintiff's First Amendment retaliation claim on the basis that Plaintiff has failed to establish that he suffered an adverse action when Defendant Knaub told him to go to his cell, the Court will grant their motion.  Because, however, Defendants have not addressed Plaintiff's remaining alleged adverse action, i.e., being sprayed with OC spray, the Court will deny their motion to the extent that they would seek summary judgment on this basis.[12]

---

[12]  Defendants acknowledge that the amended complaint contains allegations that Defendant Knaub retaliated against Plaintiff by deploying OC spray without

### c.   Causation

Finally, Defendants argue that Plaintiff has failed to show causation, the third and final element of his First Amendment retaliation claim against Defendant Knaub.  (Doc. No. 66 at 26-30.)  In support, Defendants argue that Plaintiff claims that he filed grievances about his radio being confiscated and about staff misappropriation of the radio after the events transpired in February and May of 2020.  (Id. at 28 (citing Doc. No. 16 ¶¶ 5, 13, 15, 19).) Defendants further argue, however, that Plaintiff claims that the alleged retaliatory event, i.e., the use of OC spray against him, did not occur until June 28, 2021, thirteen (13) months later.  (Id. at 28-29.)  In connection with this thirteen (13)-month period, Defendants contend that this "is an insufficient temporal window to establish a causal connection in a retaliation claim."  (Id. at 29.)  The Court agrees.

In order for Plaintiff to state a prima facie case of retaliation, he must allege that the constitutionally protected activity he engaged in was "'a substantial or motivating factor'" for the adverse action that he allegedly suffered.  See Rauser, 241 F.3d at 333 (quoting Mount Healthy, 429 U.S. at 287).  Because "motivation is almost never subject to proof by direct evidence," a prisoner-plaintiff must typically "rely on circumstantial evidence to prove a retaliatory motive."  See Watson, 834

---

warning.  (Doc. No. 66 at 27.)  The Court surmises that Defendants are conceding that such allegations constitute an adverse action.

F.3d at 422.  The prisoner-plaintiff "can satisfy his burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."  See id. (footnote omitted).

As it pertains to Plaintiff's constitutionally protected activity of filing grievances in February and May of 2020, the Court concludes that the use of OC spray thirteen (13) months later on June 28, 2021, is simply insufficient to show an unusually suggestive temporal proximity between the filing of his grievances and the alleged retaliatory conduct.  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (stating that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment" (citations omitted)).  In addition, while Plaintiff appears to argue that the issues concerning the radio were an "ongoing complaint" (Doc. No. 70 at 8), Plaintiff has neither alleged nor shown any pattern of antagonism as it pertains to Defendant Knaub.  At most, Plaintiff offers broad allegations that he filed a private criminal complaint (id.) and that he wrote to "prison officials supervisors, prison advocacy groups[,] media, [and] state lawmakers" (Doc. No. 16 ¶ 21).  Thus, without such specific factual allegations or evidentiary support, that Defendant Knaub displayed an intervening animus between the filing of Plaintiff's grievances and the use of OC spray, the Court concludes that Plaintiff has

49

failed to plead, much less create a genuine dispute of material fact as to, the causation element of his retaliation claim.

However, as it pertains to Plaintiff's constitutionally protected activity of complaining about an allegedly false misconduct, Defendants reassert their earlier argument that "Plaintiff cannot amend his operative complaint within an opposition to summary judgment[,]" and as such, "this claim cannot be litigated in this case." (Doc. No. 75 at 18.)  The Court, however, is unpersuaded.  As discussed above, the amended complaint alleges that Defendant Knaub also retaliated against Plaintiff for "complaining about the back dated misconduct."  (Doc. No. 16. ¶ 37.)  Moreover, and as also discussed above, all of Plaintiff's relevant grievances (i.e., grievances 934590, 935485, and 935632) track with this allegation as they either explicitly state or sufficiently suggest that Defendant Knaub sprayed Plaintiff with OC spray in retaliation for him complaining about an allegedly false misconduct he wrote.  (Doc. Nos. 75-1 at 2 (stating, inter alia, that the use of OC spray "was retaliation for a false . . . misconduct [Defendant Knaub] wrote"); 63-8 at 3 and 5 (raising allegations to suggest that Defendant Knaub ordered him to his cell and used OC spray on him because he was "complaining about a false misconduct he wrote against [Plaintiff]").)

Thus, because the Court treats the amended complaint as asserting allegations that Plaintiff engaged in constitutionally protected conduct when he complained

about the allegedly false misconduct, the Court is unpersuaded by Defendants'
remaining argument.  Additionally, the Court notes that, Plaintiff's allegations—i.e.,
that he complained to Defendant Knaub about the allegedly false misconduct and
that shortly after Defendant Knaub deployed OC spray on Plaintiff—can certainly
provide a basis to infer an unusually suggestive temporal proximity.  Accordingly,
Defendants' motion for summary judgment will be denied on this basis.

### d.   Conclusion as to Plaintiffs' First Amendment Retaliation Claim

Accordingly, for all of these reasons, the Court will grant in part and deny in
part Defendants' motion for summary judgment as it relates to Plaintiff's First
Amendment retaliation claim against Defendant Knaub.   The Court will allow
Plaintiff to proceed on his claim that Defendant Knaub used OC spray against him
in retaliation for complaining about an allegedly false misconduct.

### 4.   Plaintiff's Eighth Amendment Medical Care Claim Against Defendants

In addition, Defendants seek summary judgment on Plaintiff's Eighth
Amendment denial of medical care claim.   (Doc. Nos. 62, 66.)   "The Eighth
Amendment . . . prohibits the infliction of 'cruel and unusual punishments' on those
convicted of crimes." See Wilson v. Seiter, 501 U.S. 294, 296–97 (1991).  However,
the United States Constitution "does not mandate comfortable prisons, and only
those deprivations denying the minimal civilized measure of life's necessities, are

sufficiently grave to form the basis of an Eighth Amendment violation." See id. 501 U.S. at 298 (internal citations and quotation marks omitted).  Thus, in order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test[.]"  See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

Under the first prong, courts consider whether the deprivation was "'objectively, sufficiently serious[,]" that is, whether "a prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities[.]'"  See id. (quoting Farmer, 511 U.S. at 834).  And, under the second prong, courts must consider whether the prison official was "'deliberate[ly] indifferen[t] to inmate health or safety.'"  See id. (quoting Farmer, 511 U.S. at 834).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010) (explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and

[to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837.  "The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38)).

In accordance with these standards, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated[,]" see Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999), and prison officials violate the Eighth Amendment "when they are deliberately indifferent to an inmate's serious medical need."  See Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (citing Estelle, 429 U.S. at 106); Rouse, 182 F.3d at 197 (explaining that plaintiffs must demonstrate the following two (2) elements: (1) "that the defendants were deliberately indifferent to their medical needs[;]" and (2) "that those needs were serious").

53

"[T]he concept of a serious medical need, as developed in Estelle, has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences."  See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991).  The "condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death[,]" and "the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  See id. (citation and internal quotation marks omitted).

The concept of "deliberate indifference" requires that the prison official actually knew of and disregarded "an excessive risk to inmate health or safety[.]" See Farmer, 511 U.S. at 837. The Third Circuit has found deliberate indifference when a "prison official: (1) knows of a prisoner's need for medical treatment and intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." See Rouse, 182 F.3d at 197 (citation omitted).

As stated above, Defendants seek summary judgment on Plaintiff's Eighth Amendment denial of medical care claims.  (Doc. Nos. 62, 66.)   In support, Defendants argue that Plaintiff received medical assessment and care after the incident on June 28, 2021.  (Doc. No. 66 at 30.)  Defendants further argue that they

are two (2) non-medical personal and cannot be deemed to have been personally involved in Plaintiff's claims regarding the denial of medical care.  (Id. at 31.) Finally, Defendants contend that Plaintiff has put forth no averment or evidence that either Defendant Knaub or Defendant Harry had any knowledge that he was under the care of medical professionals, that such care was deficient, or that they, in some way, allegedly denied him access to such care.  (Id.)  The Court agrees.

Assuming arguendo that Plaintiff has sufficiently alleged a serious medical need,[13] there is no evidence of record to create a genuine dispute of material fact that Defendants acted with deliberate indifference to that serious medical need.  More specifically, there is no evidence of record that Defendants actually knew of and disregarded an excessive risk to Plaintiff's health or safety.  See Farmer, 511 U.S. at 837 (explaining that the prison official must be aware of facts from which the inference could be drawn that an excessive risk of harm exists, and the prison official must also draw that inference).

Additionally, while the Third Circuit has found deliberate indifference in three (3) instances in the prison medical care context, the Court finds that none of those instances are applicable here.  See Rouse, 182 F.3d at 197 (finding deliberate indifference when a "prison official: (1) knows of a prisoner's need for medical

---

[13]    Defendants do not address the "serous medical need" element of an Eighth Amendment medical care claim.  (Doc. Nos. 66, 75.)  Instead, they focus on the "deliberate indifference" element.  (Id.)

treatment and intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment" (citation omitted)).  Indeed, there is no evidence of record to suggest that Defendants, who Plaintiff does not dispute are not medical professionals, intentionally refused to provide him with medical treatment or otherwise prevented him from, or delayed him in, receiving such treatment from medical professionals.

Moreover, while Plaintiff denies that he received medical care, the record plainly shows that Plaintiff was assessed and treated by medical professionals. (Doc. Nos. 63-1 at 3-4, 6, 8, 19, 27, 34, 35, 38-41, 47-60.)  And, further, there is no suggestion in the record that, at the time Plaintiff was assessed and treated, Defendants knew of any facts from which the inference could be drawn that there was an excessive risk of harm to Plaintiff's health or safety or that they actually made that inference.

Accordingly, for all of these reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment medical care claim. The Court will, therefore, grant their motion for summary judgment on this basis. See Farmer, 511 U.S. at 844 (explaining that "prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment[,]" and, thus, "[p]rison officials charged with deliberate indifference might show, for example, that they did not

know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent").

### 5. Plaintiff's Eighth Amendment Excessive Use of Force Claim Against Defendant Knaub

Defendants also seek summary judgment on Plaintiff's excessive use of force claim against Defendant Knaub. (Doc. Nos. 62, 66.)  "The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  Glossip v. Gross, 576 U.S. 863, 876 (2015). "The Supreme Court has interpreted this prohibition . . . to bar prison officials from using excessive force against inmates[.]"  Young v. Martin, 801 F.3d 172, 177 (3d Cir. 2015) (citing Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)).

As set forth above, in order to establish that a prison official has violated the Eighth Amendment, a plaintiff must show two (2) elements—a subjective and objective element. See Hudson, 503 U.S. at 8.  First, the plaintiff must show that the defendant official acted with a "sufficiently culpable state of mind[.]"  See Wilson, 501 U.S. at 298.   And, second, the plaintiff must show that the conduct was objectively "sufficiently serious" to violate the Constitution.  See id.

Where a prison defendant is alleged to have used excessive force in violation of the Eighth Amendment, the pertinent inquiry for the  subjective element is

"whether [the] force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  See Hudson, 503 U.S. at 7; Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 21, 230-31 (3d Cir. 2015) (explaining that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,]" and "[t]his is true whether or not significant injury is evident").

In conducting this inquiry, there are several factors that a court must consider in determining whether a prison defendant has used excessive force against a prisoner, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'"  See Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

As for the objective element, the inquiry focuses on whether the prison official's actions were "harmful enough," see Hudson, 503 U.S. at 8, or "sufficiently serious," see Wilson, 501 U.S. at 298.  "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action."  See Wilkins, 559 U.S. at 37 (citation omitted).  As a result, "[t]he Eighth Amendment's prohibition of 'cruel and unusual'

punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" See Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 327).   Rather, the Eighth Amendment prohibits the use of force that offends "contemporary standards of decency[,]" regardless of whether "significant injury is evident[;]" although, the extent of injury may provide "some indication of the amount of force applied" or "whether the use of force could plausibly have been thought necessary in a particular situation" See Wilkins, 559 U.S. at 37 (citation, internal citation, and internal quotation marks omitted).

Here, Plaintiff's Eighth Amendment excessive use of force claim arises from the use of OC spray. (Doc. No. 16.)  Defendants argue, based upon their version of the facts, that Defendant Knaub gave Plaintiff an order to return to his cell and that Defendant Knaub warned Plaintiff that OC spray would be deployed against him if he did not comply with that order and return to his cell.  (Doc. No. 66 at 35.) Defendants further argue that Plaintiff did not comply with the direct order and, instead, challenged the order and proceeded to move towards Defendant Knaub while reaching for a weapon.  (Id.)  Defendants contend that Defendant Knaub's single, isolated burst of OC spray to regain compliance of Plaintiff was for a legitimate penological objective.  (Id.)   As a result, Defendants submit that

Defendant Knaub is entitled to summary judgment on Plaintiff's Eighth Amendment claim.  (Id.)

In response, however, Plaintiff asserts that there are several material facts in dispute (Doc. No. 70 at 13), and the Court agrees.  First, there is a dispute concerning the need for the application of force and the extent of the alleged threat since—according to Plaintiff's version of the facts—there was no need for the use of OC spray because he had turned to go to his cell and had only looked back at Defendant Knaub and, thus, did not pose a threat.  (Doc. No. 72 ¶ 33.)  Second, there is a dispute as to the relationship between the need for the application of force and the amount of force that was used, since—according to Plaintiff's version of the facts—"dangerous quantities" of OC spray were deployed on him.  (Id. ¶ 37.)  Third, there is a dispute as to any efforts that were made to temper the severity of the force applied since—according to Plaintiff's version of the facts—Defendant Knaub did not call for a supervisor or try to defuse the situation in any way.  (Id. ¶ 37.)

Moreover, while it appears that the events at issue were captured on videotape, neither party submitted that videotaped evidence to the Court.  Thus, while the videotaped evidence could have been used to refute Plaintiff's claim of excessive use of force, as recognized by Defendants (Doc. No. 66 at 34), the Court is unable to draw such an inference.  See, e.g., Smalls v. Sassaman, 2019 WL 4194211, at *8 (M.D. Pa. Sep. 4, 2019) (explaining that if a review of the videotape "refutes an

inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate" (citing Tindell v. Beard, 351 Fed. Appx. 591 (3d Cir. 2009) (unpublished))).

Thus, although the Court understands Defendants' position and observes that documentary evidence supports their position, and might well lead to a verdict in their favor at trial, their position is controverted by genuine disputes of material fact adduced by Plaintiff.[14]  These genuine disputes of material fact preclude summary judgment on Plaintiff's Eighth Amendment excessive use of force claim.  See Porter, 974 F.3d at 443 (explaining that a district court, in ruling on a motion for summary judgment, may consider a plaintiff's sworn verified complaint to the extent that it is based on "personal knowledge and set[s] out facts that would be admissible in evidence" (citations omitted)); Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir. 2018) (explaining that "a single, non-conclusory affidavit . . . when based on personal knowledge and directed at a material issue, is sufficient to defeat summary

---

[14]  While a prison official's use of OC spray against a prisoner may not constitute excessive force under the Eighth Amendment, see, e.g., Jones v. Wetzel, 737 F. App'x 61, 65-66 (3d Cir. 2018) (unpublished), there are, as discussed above, disputes of material fact here concerning whether, inter alia, Defendant Knaub's use of force was necessary and whether other efforts could have been made to temper the severity of the force applied.  See, e.g., id. at 65 (stating that "the overwhelming undisputed evidence show[ed] that pepper spray was used as a method of last resort to manage [the prisoner-plaintiff's] admitted violations of basic prison safety rules").

judgment" and that, "[t]his is true even where, as here, the information is self-serving" (citations and internal quotation marks omitted)); <u>Brooks v. Kyler</u>, 204 F.3d 102, 105-109 (3d Cir. 2000) (observing that the prisoner-plaintiff responded to defendants' motion for summary judgment on the Eighth Amendment excessive use of force claim "by submitting an affidavit setting forth his version of the events and arguing that he had been provided with inadequate discovery[,]" and ultimately concluding that, in accepting the plaintiff's allegations, "a jury could find that the defendants acted not merely in good faith to maintain or restore discipline, but rather out of malice for the very purpose of causing harm" and, thus, it was improper to grant defendants summary judgment on this claim).

To conclude otherwise would require the Court to resolve the factual dispute in the record by weighing the evidence and making a credibility determination as to whose version of the events is more believable, which is inappropriate in connection with a motion for summary judgment. <u>See</u> <u>Anderson</u>, 477 U.S. at 249 (instructing that, "[a]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"); <u>Carvalho-Grevious v. Delaware State Univ.</u>, 851 F.3d 249, 262 (3d Cir. 2017) (stating that "[c]redibility determinations are for the factfinder and are inappropriate at the summary judgment stage" (citation omitted)).

Accordingly, for all of these reasons, the Court will deny Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive use of force claim.

### 6.    Plaintiff's Fourteenth Amendment Due Process Claim

Additionally, Defendants seek summary judgment on Plaintiff's Fourteenth Amendment procedural due process claim concerning his ninety (90)-day solitary confinement that was issued as a sanction in connection with the June 28, 2021 incident concerning Defendant Knaub.   (Doc. Nos. 62, 66.)   The Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]"   See U.S. Const. amend. XIV, § 1.   "The core concept of due process is protection against arbitrary government action" and, as that core concept has developed over time, "it has come to have both substantive and procedural components."   See Evans v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 650, 658 (3d Cir. 2011) (citation and internal citation omitted).   The substantive component "limits what government may do regardless of the fairness of procedures that it employs[.]"   See Boyanowski v. Cap. Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000).   And the procedural component "governs the manner in which the government may infringe upon an individual's life, liberty, or property."   See Evans, 645 F.3d at 662.

Although unclear, Plaintiff appears to assert a state-created liberty interest regarding the time he spent in disciplinary custody.   (Doc. No. 16.)   With respect to

state-created liberty interests, the United States Supreme Court has held that these types of interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." See Sandin v. Conner, 515 U.S. 472, 484 (1995) (internal citations omitted); Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (stating that, "[a]fter Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'" (quoting Sandin, 515 U.S. at 484)).   In addition, when courts are determining whether a state-created liberty interest exists, they are not to "compare the prisoner's own life before and after the deprivation."  See Powell v. Weiss, 757 F.3d 338, 344 (3d Cir. 2014).

Instead, "[t]he baseline for determining what is atypical and significant—the ordinary incidents of prison life—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law."  See id. (citations and internal quotation marks omitted).  As a result, "confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life

necessary to implicate a liberty interest."  See Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (quoting Sandin, 515 U.S. at 486).

As stated above, Defendants seek summary judgment on Plaintiff's due process claim concerning the ninety (90) days he spent in disciplinary custody. (Doc. Nos. 62, 66.)  In support, they argue that this period of time in custody is insufficient to show a violation of his constitutional rights.  (Doc. No. 66 at 41.)  The Court agrees.  Plaintiff's placement in disciplinary custody for ninety (90) days does not establish an atypical and significant hardship such that it triggers due process protection.  See, e.g., Griffin, 112 F.3d at 708 (concluding that the inmate's "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed . . . by a court of law" and does not constitute a due process violation (quotation omitted)); Murray v. McCoy, No. 1:21-cv-00320, 2023 WL 2285877, at *11 (M.D. Pa. Feb. 28, 2023) (concluding that ninety (90) days in disciplinary confinement was insufficient to establish an atypical or significant hardship sufficient to trigger due process protection (citations omitted)).  And, notably, despite Plaintiff filing a lengthy opposition brief, he has not set forth any arguments concerning this claim and, thus, is deemed not to oppose Defendants' arguments.

Accordingly, for all of these reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment due process

claim concerning his ninety (90)-day solitary confinement.  As such, the Court will grant Defendants' motion for summary judgment on this basis.

### 7.   Plaintiff's Official Capacity Claims

Plaintiff has sued Defendants in both their individual and official capacities. (Doc. No. 16 at 10, 11.)  In moving for summary judgment, Defendants argue that, to the extent they have been sued in their official capacities, Plaintiff's claims are barred by sovereign immunity.  (Doc. No. 66 at 22-23.)  As such, they request the Court to grant their motion for summary judgment on any Section 1983 claims that Plaintiff has asserted against them in their official capacities.  (Id.)

While Defendants quite "literally are persons[,]" a suit for monetary damages brought against a state official in his official capacity is not a suit against that official; it is a suit against that official's office.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Allen v. New Jersey State Police, 974 F.3d 497, 506 (3d Cir. 2020).  This is no different from a suit against the State itself, which is barred by the Eleventh Amendment unless (1) the State has waived its immunity or (2) Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity.  See Will, 491 U.S. at 66, 70-71.

The Court finds that these two (2) exceptions to Eleventh Amendment immunity, a state waiver or congressional abrogation, do not apply here.  As explained by the United States Court of Appeals for the Third Circuit, "Pennsylvania

has not waived its sovereign immunity defense in federal court[,]" and "Congress did not abrogate Eleventh Amendment immunity via [Section] 1983[.]"  See Downey, 968 F.3d at 310 (citation omitted; see also 42 Pa. Stat. and Cons. Stat. Ann. § 8521(b) (stating that "[n]othing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States"); Quern v. Jordan, 440 U.S. 332, 345 (1979) (concluding that the history and language of Section 1983 establish that Congress did not intend to make the States liable under that statute).

Thus, to the extent that Defendants seek dismissal of Plaintiff's Section 1983 claims for monetary damages against Defendants in their official capacities, the Court concludes that Defendants are entitled to summary judgment.  See Will, 491 U.S. at 61-71.   Additionally, to the extent that Defendants seek dismissal of Plaintiff's Section 1983 claims for injunctive relief against Defendants in their official capacities, the Court concludes that Defendants are also entitled to summary judgment, but only in part.

Here, Plaintiff's amended complaint seeks "any injunction orders that may be just under the law." (Doc. No. 16 at 29.)  Although it is unclear what Plaintiff intends by this request for injunctive relief, he argues in his opposition brief that he is permitted to seek injunctive relief in the form of (a) the expungement of his

misconduct record and (b) the issuance of a "policy protecting [him] from this ever again." (Doc. No. 70 at 6.)  In response, Defendants argue that Plaintiff's request concerning the expungement of his misconduct record is retrospective injunctive relief (not prospective) and, thus, barred by Eleventh Amendment immunity. (Doc. No. 75 at 14.)  Defendants have not addressed, however, Plaintiff's other request concerning a "policy" that would protect him.  See (id. at 14-15).

When a plaintiff sues state officials in their official capacities for prospective injunctive relief under Section 1983, Eleventh Amendment immunity is not extended to those officials. See id. at 71 n.10 (noting that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State" (citations omitted)); Iles v. de Jongh, 638 F.3d 169, 177 (3d Cir. 2011) (explaining that a state employee may be sued in his official capacity, not "for all injunctive relief," but rather, only for "prospective injunctive relief," because official-capacity claims for prospective injunctive relief are not treated as actions against the State (citing Will, 491 U.S. at 71 n.10) (emphasis in original)).

Here, Plaintiff seeks retroactive injunctive relief in the form of his misconduct being expunged—that is, he seeks relief to cure a past wrongdoing. (Doc. Nos. 16 at 29; 70 at 6); see also Lee-Chima v. Hughes, No. 1:20-cv-02349, 2022 WL 2677474, at *8 (M.D. Pa. July 11, 2022) (explaining that the inmate sought

"expungement of the misconduct from his record and a lowering of his custody level, which is retroactive injunctive relief"), appeal dismissed sub nom. Chima v. Hughes, No. 22-2635, 2022 WL 18957447 (3d Cir. Oct. 25, 2022).  Thus, the Court agrees with Defendants that his claim for such retroactive injunctive relief is barred by Eleventh Amendment immunity.  However, Plaintiff also seeks prospective injunctive relief in the form of the issuance of a "policy" that would affect future conduct.  Defendants have not addressed this particular claim for injunctive relief, and, thus, the Court will allow it to proceed at this time.

Accordingly, for all of these reasons, the Court will grant Defendants' motion for summary judgment to the extent that they seek judgment on Plaintiff's Section 1983 official-capacity claims against Defendants for monetary damages and retroactive injunctive relief.  The Court will deny, however, Defendants' motion for summary judgment to the extent that they seek judgment on Plaintiff's Section 1983 official-capacity claims for prospective injunctive relief.

### 8.    Qualified Immunity

Finally, as to Plaintiff's constitutional claims, Defendants move for summary judgment on the basis that they are entitled to qualified immunity.  (Doc. Nos. 62, 66.)  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Clark v. Coupe, 55 F.4th 167,

178 (3d Cir. 2022) (citations omitted).  In determining whether officials are entitled to such qualified immunity, courts "engage in a two-part analysis: (1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether that right was clearly established when it was allegedly violated to the extent that it would have been clear to a reasonable person that his conduct was unlawful."  See id. (citation and quotation marks omitted).

Under the first prong, courts "must define the right allegedly violated at the appropriate level of specificity."  See Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021) (citation and internal quotation marks omitted).  This prong requires courts "to frame the right in light of the specific context of the case, not as a broad general proposition."  See id. (citations and quotation marks omitted).

Under the second prong, courts "must ask whether that right was clearly established at the time of its alleged violation, i.e., whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right."  See id. (citations and internal quotation marks omitted).  This prong "is an "objective (albeit fact-specific) question, where [the defendants'] subjective beliefs . . . are irrelevant."  See id. (citations and internal quotation marks omitted).

Additionally, in order to determine whether the right was clearly established at the time of its alleged violation, courts must first look "to factually analogous Supreme Court precedent, as well as binding opinions from [the Third Circuit Court

of Appeals[.]"  See id. (citation omitted).  Courts must next "consider whether there is a robust consensus of cases of persuasive authority in the Courts of Appeals."  See id. (citations and internal quotation marks omitted).  Additionally, courts "may also take into account district court cases, from within the Third Circuit or elsewhere."  See id. at 165-66 (citations omitted).

In assessing such case law, courts "must keep in mind that [the Third Circuit] takes a broad view of what constitutes an established right of which a reasonable person would have known."  See id. at 166.  In fact, "a right may be clearly established even without a precise factual correspondence between the case at issue and a previous case."  See id. (citations and internal quotation marks omitted); Ashcroft, 563 U.S. at 741 (explaining that, even though "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate" (citations omitted)).  Thus, "[a] public official does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case."  See Peroza-Benitez, 994 F.3d at 165 (quoting Kopec v. Tate, 361 F.3d 772, 778 (3d Cir. 2004)).

In addition, the burden of establishing qualified immunity lies with the defendants. See Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010).  The defendants satisfy this burden "only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established

law, that their conduct comported with recognized legal standards." <u>See E. D. v. Sharkey</u>, 928 F.3d 299, 306 (3d Cir. 2019) (citation omitted).  And, finally, the issue of qualified immunity should be resolved "at the earliest possible stage" in the litigation. <u>See Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (citations omitted).

Here, in addition to the various arguments set forth above, Defendants assert that they are entitled to qualified immunity with respect to Plaintiff's surviving Eighth Amendment excessive use of force claim against Defendant Knaub.[15] However, the Court has already determined that, with respect to this claim, there is a genuine dispute of material fact as to whether Defendant Knaub used force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>See Hudson</u>, 503 U.S. at 7. More specifically, there are disputes concerning the need for the application of force, the extent of the alleged threat, the relationship between the need for the application of force and the amount of force that was used, and any efforts that were made to temper the severity of the force applied.

---

[15]  Defendants also assert that they are entitled to qualified immunity with respect to Plaintiff's First Amendment retaliation claim concerning the grievances he filed in February and May of 2020.  (Doc. No. 66 at 44.)  However, as discussed above, Defendants will be granted summary judgment on Plaintiff's First Amendment retaliation claim concerning his grievances.  Thus, the Court need not address it here.

As such, the Court concludes that the determination of whether Defendant Knaub is entitled to qualified immunity on this claim is not properly before the Court because Defendants' motion relies upon a version of the facts that remain in dispute.[16]   See, e.g., Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) (recognizing that the need to decide qualified immunity issues early in the litigation can conflict with "the reality" that factual disputes frequently need to be resolved in order to determine whether the defendant's conduct violated a clearly established constitutional or statutory right (citation omitted)); Giles v. Kearney, 571 F. 3d 318, 326 (3d Cir. 2009) (stating that, although "[t]he issue of qualified immunity is generally a question of law, . . . a genuine issue of material fact will preclude summary judgment on qualified immunity" (citations omitted)); Curley v. Klem, 298 F. 3d 271, 278 (3d Cir. 2002) (stating that, "[j]ust as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis").

Accordingly, given these genuine disputes of material fact, the Court concludes that Defendants have not carried their burden to establish that they are

---

[16] For instance, Defendants assert only that "OC spray may be used to gain compliance with an officer's orders[.]"  (Doc. No. 66 at 44.)  However, there are disputes of material fact in the record as to whether this use of force was necessary to gain Plaintiff's compliance.

entitled to qualified immunity.  The Court will, therefore, deny Defendants' motion for summary judgment on this basis.  See, e.g., Burk v. Runk, No. 19-cv-01358, 2021 WL 6126233, at *8 (M.D. Pa. Dec. 28, 2021) (finding that, "[b]ecause [plaintiff] ha[d] made a showing sufficient to overcome Defendants' Rule 56 motion as to the merits of [plaintiff's] failure-to-protect claim, [plaintiff] has also made a showing sufficient to overcome any claim to qualified immunity" (citation, and internal citation and quotation marks omitted)); Miller v. Bedford Cnty., No. 18-cv-10, 2022 WL 969963, at *8 (W.D. Pa. Mar. 31, 2022) (stating that "[t]he Third Circuit has explained, in the context of an Eighth Amendment claim, that when a plaintiff makes a showing sufficient to overcome summary judgment on the merits, [he or she has] also made a showing sufficient to overcome any claim to qualified immunity" (alterations in original) (citation and internal quotation marks omitted)).

### 9.   Sovereign Immunity

In the amended complaint, Plaintiff broadly asserts state law claims of assault, battery, and negligence against Defendants.  (Doc. No. 16 at 9-10.)  Plaintiff does not specify, however, which particular claims are asserted against each Defendant. See (id.).  That said, Plaintiff's amended complaint, when read as a whole, suggests that he is asserting assault and battery claims against Defendant Knaub based upon the alleged use of excessive force on June 28, 2021, and a negligence claim against Defendant Harry based upon his transfer from SCI Camp Hill to SCI Phoenix,

following that alleged use of force.

Defendants argue that they should be granted summary judgment on these claims because they are entitled to sovereign immunity under state law.  (Doc. No. 66 at 41-43.)  In support, Defendants appear to rely on 1 Pa. Cons. Stat. Ann. § 2310, which provides that officials and employees of the Commonwealth of Pennsylvania, "acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity."  See 1 Pa. Cons. Stat. Ann. § 2310.

There are, however, ten (10) enumerated exceptions in which the Commonwealth has waived sovereign immunity.  See 42 Pa. Cons. Stat. Ann. § 8522.  These exceptions are for negligent acts involving: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.  See id. § 8522 (a), (b).  Because the legislature has waived the general grant of sovereign immunity only in these ten (10) instances, the exceptions must be strictly construed. See Moser v. Heistand, 681 A.2d 1322, 1326 (Pa. 1996) (citation omitted).

Here, Defendants contend that none of these exceptions are applicable in this case.  (Doc. No. 66 at 41.)  Additionally, they contend that, at the time of the alleged

events, they were employed by the DOC, a state agency, and they were acting within the scope of their employment.  (Id. at 42.)  As a result, they argue that they are entitled to sovereign immunity on Plaintiff's state law claims.  (Id. at 41-43.)

Plaintiff, despite filing a lengthy brief in opposition, has not opposed Defendants' arguments.  See (Doc. No. 70).  As a result, the Court deems him not to oppose their arguments.  That said, Defendants are correct that Pennsylvania employees are entitled to immunity from most state law claims, provided that they act "within the scope of their duties."  See 1 Pa. Cons. Stat. § 2310; Justice v. Lombardo, 652 Pa. 588, 603 (2019). Defendants are also correct that, since they were employees of the DOC at the time of the alleged events, they are entitled to the protections of sovereign immunity for such acts within the scope of their duties, subject to the exceptions set forth above, none of which the Court finds are applicable here.  Thus, the critical issue before the Court is whether it can be said that Defendants were acting within the scope of their employment.

"Pennsylvania has accepted the Restatement (Second) of Agency's definition of conduct 'within the scope of employment.'"  Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000) (citations omitted).  According to the Restatement, conduct is within the scope of employment where: (a) "it is of the kind" the employee is employed to perform; (b) "it occurs substantially within the authorized time and space limits;" (c) it is actuated, at least in part, by a purpose to serve the [employer][;]

and (d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer]." See Restatement (Second) of Agency § 228(1); Brumfield, 232 F.3d at 380; Justice, 652 Pa. at 604 (applying Restatement (Second) of Agency § 228(1)).)

"On the other hand, an employee's conduct 'is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" See id. (quoting id. § 228(2)).   As explained by the Pennsylvania Supreme Court, subsequent sections of the Restatement (Second) of Agency "provide additional criteria for assessing whether conduct falls within the scope of employment[,]" as follows:

> Section 229 provides that "to be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to that authorized." Id., § 229(1). It also enumerates ten "matters of fact" to be considered in determining whether or not conduct, although unauthorized, is nevertheless so similar to or incidental to the conduct authorized that it is still within the scope of employment. Id., § 229(2). Pursuant to section 230, "an act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Id., § 230. Section 231 provides that "an act may be within the scope of employment although consciously criminal or tortious." Id., § 231. Pursuant to section 235, "an act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." Id., § 235.

See Justice, 208 A.3d at 1067.

"[B]ecause sovereign immunity is an affirmative defense, . . . the defendant carries the burden . . . of proving that his conduct was within the scope of his employment." Id. at 1068 (citations and internal citation omitted). However, "whether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury." See id. (citations omitted). "[T]he only exception to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute." See id. (citations omitted). In that case, courts may decide the issue as a matter of law. See id. (citation omitted). Where, however, "more than one inference may be drawn from the facts, the issue of whether an employee was acting within the scope of employment is for the jury." See id.

Here, as discussed at length above, there are factual disputes concerning Defendant Knaub's use of force against Plaintiff. The Court need not rehash those disputes of fact here. However, based upon those disputes, the Court concludes that resolution of whether Defendant Knaub was acting within the scope of his employment is an issue that must be presented to the jury. Indeed, viewing the evidence in the light most favorable to Plaintiff, as the Court is required to do, a jury could conclude, under the circumstances of this case, that Defendant Knaub's use of force was not within the scope of his employment with the DOC. Just because Defendant Knaub is authorized to use force in certain situations in the prison setting,

does not necessarily mean that he is always authorized to use force, irrespective of the extent of that force or the reason for using it. See Justice, 208 A.3d at 1070-71 (concluding that the issue of whether the Pennsylvania State Police trooper's use of force was within the scope of his employment involved disputed evidence that was "properly put to the jury").

As such, the Court cannot conclude as a matter of law that Defendant Knaub was acting within the scope of his employment such that he is entitled to sovereign immunity on Plaintiff's assault and battery claims. The Court will, therefore, deny Defendants' motion for summary judgment on this basis.

However, the Court will grant Defendants' motion for summary judgment on the basis that Defendant Harry is entitled to sovereign immunity with respect to Plaintiff's negligence claim. Defendant Harry's alleged involvement in transferring Plaintiff to another correctional institution is an act that falls within her line of duties as a superintendent for the DOC. Indeed, it has long been understood that such housing assignments are matters of internal prison administration, requiring the exercise of discretion by prison officials, such as Defendant Harry. See generally Bell v. Wolfish, 441 U.S. 520, 547 (1979) (explaining that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (citations omitted)); Sandin v.

Conner, 515 U.S. 472, 482-83 (1995) (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment" (citations omitted)).

### C.    Plaintiff's Motion for Partial Summary Judgment

Finally, the Court addresses Plaintiff's motion for partial summary judgment. (Doc. No. 51.)  In Plaintiff's motion, he seeks summary judgment on the following claims: (1) his First Amendment retaliation claims against Defendants Knaub and Harry; (2) his Eighth Amendment excessive use of force claims against Defendant Knaub and Harry; and (3) his Eighth Amendment denial of medical care claims against Defendants Knaub and Harry.  (Id.)  Defendants have opposed Plaintiff's motion and have asserted several arguments in support thereof.  (Doc. No. 58.) Those arguments are, essentially, the same arguments that they have asserted in connection with their motion for summary judgment. See (id.). Thus, because the Court has already resolved Defendants' motion for summary judgment, it need not reach all of Plaintiff's arguments.  Indeed, the Court's rulings above with respect to Defendants' motion for summary judgment addresses Plaintiff's claims.

Regarding Plaintiff's First Amendment retaliation claim and Eighth Amendment excessive use of force claim against Defendant Harry, the Court granted Defendant Harry summary judgment on the basis that Plaintiff failed to exhaust available administrative remedies before asserting these claims against her in federal

court.  Additionally, with respect to Plaintiff's Eighth Amendment medical care claims, the Court granted Defendants summary judgment on the basis that there is no evidence of record to create a genuine dispute of material fact that they acted with any deliberate indifference to Plaintiff's serious medical need, an element necessary to his Eighth Amendment medical care claims.  And, finally, regarding Plaintiff's Eighth Amendment excessive use of force claim against Defendant Knaub, the Court denied summary judgment on the basis that there are genuine disputes of material fact with respect to this claim.  Thus, in light of these rulings, Plaintiff's motion for partial summary judgment on these claims will be denied.

The only claim that the Court need briefly address is Plaintiff' First Amendment retaliation claim against Defendant Knaub, wherein Plaintiff alleges that Defendant Knaub retaliated against him by deploying OC spray on him after he complained about an allegedly false misconduct.  As discussed above, Defendants argued that Plaintiff did not include such allegations in his amended complaint and that, therefore, he could not attempt to amend his pleading via his brief in opposition to their motion for summary judgment. As further discussed above, however, the amended complaint alleges that Defendant Knaub retaliated against him for "complaining about the back dated misconduct." (Doc. No. 16 ¶ 37.) Moreover, all of Plaintiff's relevant grievances (i.e., grievances 934590, 935485, and 935632) reveal allegations that either explicitly state or sufficiently suggest that Defendant

Knaub sprayed Plaintiff with OC spray in retaliation for him complaining about an allegedly false misconduct he wrote.  (Doc. Nos. 75-1 at 2; 63-8 at 3, 5.)

Thus, the Court, in rejecting Defendants' arguments, has treated the amended complaint as asserting allegations that Plaintiff engaged in constitutionally protected conduct when he complained about the allegedly false misconduct that was issued by Defendant Knaub.  As a result, the Court reviews Plaintiff's motion for summary judgment in order to determine whether he has met his burden of proof on this retaliation claim.

Ultimately, the Court concludes that Plaintiff has not met his burden of proof. In particular, Plaintiff has not shown that there is no genuine dispute of material fact concerning causation—that is, that Plaintiff complaining about the allegedly false misconduct was a substantial or motivating factor in Defendant Knaub's decision to use OC spray against Plaintiff.  At most, Plaintiff has broadly referenced that there is a "prison regulation requiring that [D]efendant Knaub's informal misconduct be served on him the same date as the alleged incident[,]" and that Defendant Knaub's failure to do so was a "violation of this regulation[.]"  (Doc. No. 51 at 2.)  Plaintiff appears to suggest that, because he brought this alleged violation to Defendant Knaub's attention, Defendant Knaub retaliated against him by deploying OC spray. (Id.)  Plaintiff, however, has not filed a copy of this "prison regulation" into the summary judgment record.  Even if he had, this alone does not establish that

Defendant Knaub's decision to deploy OC spray was in fact motivated by Plaintiff bringing the alleged violation of the prison regulation to his attention. This is especially true where, as here, the Court must view Plaintiff's arguments in the light most favorable to Defendant Knaub, the non-moving party. See Anderson, 477 U.S. at 255. And, in accordance with this governing standard, the Court cannot say that no reasonable jury could find for Defendant Knaub on this causation element. As such, Plaintiff's motion for partial summary judgment will be denied as to Plaintiff's surviving First Amendment retaliation claim against Defendant Knaub.

## IV.    CONCLUSION

Accordingly, for all of the reasons set forth above, the Court will deny Plaintiff's motion to strike. (Doc. No. 64.) In addition, the Court will deny Plaintiff's motion for partial summary judgment. (Doc. No. 50.) Finally, the Court will grant in part and deny in part Defendants' motion for summary judgment. (Doc. No. 62.) This action shall proceed on the following claims: (1) Plaintiff's First Amendment retaliation claim against Defendant Knaub based upon allegations that he deployed OC spray in response to Plaintiff complaining about an allegedly false misconduct; (2) Plaintiff's Eighth Amendment excessive use of force claim against Defendant Knaub based upon allegations concerning the June 28, 2021 incident; (3) Plaintiff's Section 1983 official capacity claims for prospective injunctive relief;

and (4) Plaintiff's state law claims for assault and battery against Defendant Knaub,

also based upon allegations concerning the June 28, 2021 incident.


Dated: October 5, 2023                          s/ Sylvia H. Rambo
                                                SYLVIA H. RAMBO
                                                United States District Judge